SOUTHERN RY. CO. v. McNEILL et al.

(Circuit Court, E. D. North Carolina. August 25, 1907.)

1. CARRIERS—REGULATION OF RATES—STATUTES—IMPLIED REPEAL.

Laws N. C. 1907, p. 252, c. 217, regulating passenger and freight rates within the state, contains no provision repealing laws in existence at the time so far as the freight rates are concerned and with reference to passenger rates, but only contains section 6, which repeals Revisal 1905, § 2618, requiring all railroad companies to furnish first and second class passenger accommodations. *Held*, that all laws in existence at the time of the passage of the act of 1907, and not inconsistent therewith, were still in force, under the rule that a statute will not be construed as impliedly repealing a prior one on the same subject, unless there is an irreconcilable repugnancy, or the new law is intended to supersede the prior one and comprise in itself a complete system of legislation.

2. SAME.

Revisal N. C. 1905, § 2567, subsec. 9, conferring on railroad companies the right to make passenger rates within a maximum of five cents a mile, repealed by implication section 1099, subd. 1, which imposed on the North Carolina Railroad Commission the duty of making passenger rates.

3. SAME.

Revisal N. C. 1905, § 2567, subsec. 9, giving railroads the right to make passenger rates within a limit of five cents a mile, was repealed by Laws 1907, p. 675, c. 469, § 7, extending and enlarging the powers of the Corporation Commission.

4. CARRIERS—STATUTORY REGULATION.

Laws N. C. 1907, p. 252, c. 217, to prevent unjust discrimination in freight and passenger rates, and to fix the maximum charges therefor, and Act March 11, 1907, to extend and enlarge the power of the Corporation Commission, are not self-executing.

**5. Statutes—Construction—Repealed Acts.**

It is proper to consider a repealed statute in arriving at a particular construction of existing acts.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Statutes, §§ 299, 302-306.]

**6. Carriers—Regulation—Rates—Injunction—Parties.**

The North Carolina Railroad Commission being required by Revisal 1905, § 1106, to make railroad rates subject only to the limitation contained in Laws N. C. 1907, p. 252, c. 217, the members of such commission were proper parties to a suit to restrain enforcement of such chapter because of unconstitutionality.

**7. Courts—Federal Courts—Jurisdiction—Action Against State — Actions Against State Officers.**

The North Carolina Corporation Commission and the Attorney General being specially charged by Revisal N. C. 1905, §§ 1066, 1113, 5380, and Laws 1907, p. 251, c. 217, § 2, with the enforcement of such chapter, a suit against the Attorney General and the members of the commission to restrain the enforcement of the chapter, and other similar laws, because of alleged unconstitutionality, was not a suit against the state within Const. U. S. Amend. 11, providing that the judicial power of the United States shall not extend to any suit against one of the United States by citizens of another state, or by citizens or subjects of a foreign state.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 13, Courts, §§ 840, 844½.]

**8. Attorney General—Duties—Carriers—Statutory Regulation.**

Revisal N. C. 1905, § 1113, provides that the Corporation Commission, whenever in its judgment any corporation has violated a law, shall first give notice of such violation to the offending corporation, and, in the event of a failure of the corporation to comply with the law, shall forthwith present the facts to the Attorney General, who shall take such proceedings thereon as he may deem expedient. *Held*, that such provision is mandatory, and imposes a duty on the Attorney General when called on to prosecute any suit or action which may be deemed necessary to secure the enforcement of the railroad rate laws of the state.

**9. Words and Phrases—"Specially Charged."**

The words, "specially charged," when used in connection with a state officer's duty to enforce a statute, are not limited to a case where the officer is expressly commanded by the statute to bring suits for penalties or prosecute offenses under the act, but include every case where the officer is charged by his general duties as a law officer of the state to enforce the statute.

**10. Witnesses—Credibility—Matters of Opinion.**

Where a prior affidavit of a witness contained facts based only on an estimate, not intended to be treated as matters of fact, such affidavit, though containing statements inconsistent with the witness' subsequent testimony, did not affect his credibility.

**11. Constitutional Law—Unconstitutional Statute—Power of Federal Courts.**

The federal courts have power to declare an act of the state or federal Legislature invalid when shown to be repugnant to the Constitution.

**12. Carriers—Rates—Regulation—Injunction.**

Revisal N. C. 1905, § 1082, providing that no judge shall grant an injunction restraining order or other process staying or affecting during the pendency of any appeal, the enforcement of any determination of the Corporation Commission fixing rates or fares without requiring as a condition precedent the execution of certain bonds, etc., indicates that the Legislature intended not to interfere with the remedy by injunction in cases where it appeared that the rates fixed were confiscatory, etc.

**13. SAME—PROFITS.**

  While a railroad is not entitled to earn a profit on every mile of its road nor on every article carried by it, it is nevertheless entitled to earn a reasonable profit on its entire intrastate business.

**14. SAME—RAILROADS—MAXIMUM RATE LAW — PRELIMINARY INJUNCTION — CONTINUANCE—IRREPARABLE INJURY—MULTIPLICITY OF SUITS.**

  In a suit to restrain enforcement of Laws N. C. 1907, p. 252, c. 217 et seq., fixing maximum passenger rates, and providing for the establishment of freight rates for railroads within the state by the North Carolina Railroad Commission, on the ground that the rates fixed and provided for were unreasonably low and confiscatory, and that the act was unconstitutional as depriving complainant of its property without due process of law, a prima facie case was made by undisputed evidence, on the hearing of a motion to continue a temporary injunction restraining enforcement of the act pending the hearing on the merits, that the act provided for the establishment of rates which were confiscatory and would not render complainant a reasonable return on its investment, and that, if complainant failed to comply with the act pending the suit, it would be subjected to innumerable suits for heavy penalties. *Held* that the court was authorized to continue the injunction to preserve the status quo and prevent irreparable injury, and to avoid a multiplicity of suits.

In Equity.

Alfred P. Thom, Walker D. Hines, W. B. Rodman and Alex. P. Humphrey, for complainant.

Jas. E. Shepherd, Fred A. Woodward, Victor S. Bryant and Walter E. Daniels, for defendants.

PRITCHARD, Circuit Judge. The bill alleges that the complainant is a corporation originally created under the laws of Virginia. Under its charter, and under authority from other states, it is authorized to own, lease, control, and operate railroads not only in Virginia, but in other states of the Union; that under this power it has acquired and is operating a continuous line of railroad over 6,000 miles in length, extending through the states of Virginia, North Carolina, South Carolina, Georgia, Alabama, Mississippi, and Tennessee, and by trackage rights this system is connected with another system owned by complainant and lying in the state of Kentucky, Indiana, and Illinois. The complainant as a common carrier of freight and passengers is and has been since its organization engaged in both intra and interstate commerce over its line of road. The defendants admit the authority of the complainant to own and operate roads in North Carolina, but deny that the state of North Carolina has surrendered or given up its right to supervise, regulate, and control the complainant's line of railroad in North Carolina, and specially claims that the state has the power to fix and prescribe rates, both freight and passenger, and has the power to make rules and regulations governing the amount of freight, the furnishing of cars, and the power to prescribe penalties for any violation thereof, controlled only by the fourteenth amendment of the Constitution of the United States.

The General Assembly of North Carolina at its session of 1907 passed two laws regulating rates, the subject-matter of this controversy: (1) The passenger rate act (Pub. Laws 1907, p. 250, c. 216), which provides (section 1) for maximum passenger rate of 2¼ cents per mile,

except as to children 12 years of age or under, and as to these half price; and provides that the Corporation Commission may exempt all independently owned and operated lines of less than 60 miles in length, and certain newly constructed lines; (section 2) that wherever a road is owned, controlled, or operated, by lease or any other agreement, by any other road, the rate for the road so owned shall be determined by the rate prescribed by the act for the road owning or operating the other. The Corporation Commission is required to publish the rates prescribed by the act prior to June 1, 1907. Section 3 requires interchangeable books to be kept on sale at such stations as the Corporation Commission may designate, and requires railroads to honor mileage books issued by other roads. Section 4 provides a penalty of $500 against any railroad company violating any of the provisions of the act, and, makes a servant of the company guilty of a misdemeanor. The freight rate act (Pub. Laws 1907, p. 252, c. 217) provides (section 1) that the Corporation Commission shall not, in fixing the maximum freight rates, permit common carriers to receive a greater toll for shipment over connecting lines than the sum of the present locals, less 25 per centum, and provides that, when the freight rates on any road is not so high as the present tariff, the Commission may permit the same to be increased to the present standard. The Commission is authorized to reduce any tariff of rates when, in their opinion, such reduction shall be just, but has no power to increase any tariff of rates either by classification or otherwise. Section 2 provides penalties for rebating or discrimination. Section 3: If any shipper shall make a written application for a car or cars for use in shipment of freight, if the railroad company shall fail to furnish the said cars within four days the company shall be penalized in the sum of $5 per day, until the said cars are furnished. Section 4 provides certain penalties for failure to transport freight within a reasonable time. Section 5 directs the Corporation Commission to prepare and publish the tariff of rates, charges, and tolls authorized to be charged and collected under this act.

The complainant alleges that at the same session of the General Assembly there was passed certain other laws regulating the business of complainant, and that the effect of said laws would be to greatly increase the cost of conducting its business, and make the charge more burdensome than heretofore. Said acts are referred to by their title as follows:

(1) "An act to provide for the assessment of real estate of railroad companies in stock law territory for local benefit," ratified March 8, 1907. Pub. Laws 1907, p. 668, c. 459.

(2) "An act to prescribe the hours of service of employees for railroad companies engaged in the operation of trains," ratified March 8, 1907. Pub. Laws 1907, p. 665, c. 456.

(3) "An act to authorize the Corporation Commission to require railroads to erect and maintain union depots in towns of 2,000 inhabitants," ratified March 11, 1907. Pub. Laws 1907, p. 672, c. 465.

(4) "An act to extend and enlarge the power of the Corporation Commission," ratified March 11, 1907. Pub. Laws 1907, p. 675, c. 469.

Complainant contends: That it has property in North Carolina devoted to the business of carriage, freight and passenger, of the assessed value for taxation of $26,134,865, and that of this amount $7,213,222.74

is devoted to the intrastate commerce of North Carolina. That the property of complainant, like all other property in North Carolina, is worth more commercially than its assessed tax valuation. That the bonded indebtedness of the complainant applicable to its North Carolina property, is $24,623,078.29. The annual interest charge on said indebtedness is $714,103.08. In addition to its annual interest charge, complainant is compelled to pay for rentals and trackage in North Carolina $481,189.99. That the part of said interest, rental, and trackage charges devoted to intrastate business in North Carolina is $329,900.89 per annum, and this does not consider any question of stock or dividends on stock. The defendants in their answer admit the passage of the laws referred to, and admit the tax valuation of the property, deny any knowledge of the validity of the bonded indebtedness or the amount thereof, but allege that it is in excess of the value of the property, and allege that the complainant's stock is watered, and that the amount of bonded indebtedness and the amount of stock are merely items and elements in ascertaining the value of the property, and in ascertaining what is a just, fair, and reasonable compensation in fixing the rates.

The complainant contends that the effect of the act in respect to freight rates, and of the act in respect to passenger rates, whether taken separately or together, would, if enforced, as will appear from the figures stated in the bill, be to deprive the complainant of its property without due process of law. The complainant contends that under the laws of North Carolina the Corporation Commission is charged with the duty of making just and reasonable rates for the transportation both of freight and passengers; that it is charged with the duty of making full investigation of every element which enters into and constitutes one of the things required to be considered in fixing such rate; that prior to March 2, 1907, the Corporation Commission, after full investigation as required by law, made and established a passenger rate for complainant's lines of 3¼ cents per mile for first-class fare and 2¾ cents per mile for second-class fare, and established the present standard tariff of freight rates, and provided that, where there was a haul over two connecting lines, the rate charged by such common carriers should be the sum of the locals, less 15 per cent. Complainant contends that these rates are in the main reasonable and just, and that the same were fixed by the body charged under the law with that duty, and, wherever they are unreasonable and unjust, they are too low, and should be increased.

The complainant contends that its existing rate fabric is upon the whole property adjusted, not only in its relation to intrastate tariff, but in its relation between its interstate rates and its intrastate rates in North Carolina and in other states. It admits that there may be cited a few instances needing correction, but alleges that they are negligible, and not to be considered in this matter; that the present rates do not yield more than a just and reasonable return upon the value of the property used in the service; and that the rate charged is not higher than a just and reasonable compensation for the service rendered. whether considered on the basis of a fair return of the money invested or in respect to the service rendered. The complainant contends that

the effect of the act in respect to passenger rates and the act in respect to freight rates, whether taken separately or together, if enforced, would be to so reduce the return to complainant for the service rendered that it would deprive complainant of its property without just compensation, without due process of law, and deny to it the equal protection of the laws, and would interfere with interstate commerce. Complainant contends, if the rates mentioned are put into effect and enforced, they would reduce the revenue of complainant upon its intrastate business about $300,000 per annum; that the effect of this reduction would be to leave to the complainant only about $29,000 net earnings from its intrastate business, assuming that the costs of operation did not increase; and that the number of passengers and tonnage remained relatively the same. Complainant contends that this would be true not allowing anything for the interest on the bonded indebtedness, or for the payment of trackage or rentals, that it could not pay the interest on its bonds, much less pay any dividends, and that this return would be only .39 of 1 per cent. on the assessed valuation of complainant's property devoted to intrastate business. The complainant contends, further, that owing to the increased and increasing cost of operating expenses, occasioned in part by the legislation of the state of North Carolina, and in part by the general increasing price of commodities, that this small balance would be wiped out and a deficit would be left, even though complainant should continue to use, as it has done in the past, the utmost economy in the management of its property.

The complainant contends that section 3 of the act in respect to freight rates, which requires complainant, at any time, upon the written application of any shipper, to within four days furnish such shipper with car or cars as demanded, and, the complainant fails to furnish such cars, it shall be liable for a penalty of $5 per day, until said cars are furnished, is unconstitutional and void, for that the requirements are peremptory, and no exception is made on account of the inability of the carrier to comply with such request, although its cars may be in other states, may be actually engaged in interstate commerce, or may be prevented by an accident, congestion of tariff, or other causes beyond the control of the complainant, and is such a regulation as cannot, under the law, be made, and is a regulation depriving the complainant of the right to use its cars in fair and just proportion according to the demands made upon it, both for interstate and intrastate business; that said section is unconstitutional and void, for that it undertakes to classify the said roads in the state without any just and reasonable basis for such classification, and denies the equal protection of the laws in violation of the fourteenth amendment. The complainant contends that the said acts in respect to both freight and passenger rates by a system of enormous fines and penalties, therein sought to be imposed, closed the doors of the courts to complainant, and makes the terms upon which complainant may enter the courts so unequal as compared with other suitors, that it denies to complainant the equal protection of the laws and due process of law, in violation of the fourteenth amendment.

Complainant contends that section 3 of the act, in respect to passenger rates, requiring the complainant to keep on sale mileage books,

which shall be good in the hands of the person named therein on all the roads in the state on which the fare is the same, or less than the fare on the road of the company selling such books, and requires the complainant to redeem such mileage books, or mileage sold by another company, in payment of transportation, is unconstitutional and void, for that the regulations are so unreasonable and unjust as to deprive the complainant of the right to use its property in the conduct of its business, and such laws are not within the power of the General Assembly to enact, but impose unjust and unreasonable burdens on complainant, and deprive it of its property without due process of law. Complainant contends that the classification of railroads as attempted both in the freight rate act and passenger rate act is unjust, unreasonable, and unlawful, as having no just and proper basis on which to make such classification, and is in violation of the fourteenth amendment of the Constitution of the United States.

Complainant contends that under the said acts the corporation was, as to the act in respect to freight rates before the said act went into effect, required to prepare and publish the tariff of rates authorized by the said act, and, as to the act in respect to passenger rates, the Corporation Commission was required by said act and the laws of North Carolina to prepare a just and reasonable rate for the said railroads in North Carolina as prescribed in said act, and was required on or before June 1st to publish said rate so fixed, and the said Commission was further required to designate the places at which mileage books should be kept on sale, and that the commission was under the laws of North Carolina specially charged with the duty of enforcing the said two acts, and of the enforcement of the laws relating to common carriers, and was charged with the duty of regulating said common carriers, and had full control and supervision over such common carriers, and that the Attorney General and the Assistant Attorney General were specially charged with the duty of enforcing the laws of North Carolina, including the said two acts as against the complainant.

The complainant contends that it has the right, under the Constitution, whenever the circumstances may justify it, to increase its rates, either of passenger or of freights, when by the increased price of commodities of all kinds, including labor, the cost of operation becomes such as to make the then existing rate so low as to be confiscatory, and that it has the right, as an incident of property, and that the act of the Legislature in so far as it tends to deprive the complainant of its rights is in conflict with the fourteenth amendment of the Constitution, and is therefore void. The complainant contends that it had a right to come into a court of chancery and make defendants those representatives of the state who were specially charged, by law, with the performance of the duty of enforcing these acts, and have the validity and reasonableness and justness of the rates inquired into, and to have inquired into by a court of chancery the effect of such law upon complainant's property, and to have such property protected pending the litigation.

The defendants admit prior to March 2, 1907, the Corporation Commission, in the exercise of the power conferred upon it by law, had

established a passenger tariff of 3¼ cents per mile for first-class fare and 2¾ cents per mile for second-class fare, and had established the present standard tariff of freight rates for intrastate tariff, and had provided for a reduction of 15 per centum from the sum of the locals on a joint haul. The defendants contend, however, that a reduction of the rates heretofore established, as provided for in these acts, would not be unreasonable and unjust, and say:

(1) That, while the maximum rates fixed by the Commission prior to the acts of March 2, 1907, were for passenger tariff 3¼ cents per mile for first-class fare and 2¾ cents per mile for second-class fare, yet complainant habitually sold mileage books at 2½ cents per mile. (2) That not only did complainant sell mileage books, good over its lines, at 2½ cents per mile, but that during the summer season—that is, between June 1st and October 31st of each year—it sold season tickets from points in eastern and central Carolina to points in western Carolina at the rate of 2 cents per mile. (3) That complainant sold tickets to ministers of the gospel at about 2 cents per mile. (4) That the average of all tickets sold in North Carolina for intrastate travel was during the year ending June 30, 1904, 2.39 cents per mile, and during the year 1905 2.386 cents per mile, and during the year 1906 2.508 cents per mile, and that the average over complainant's entire system for the year 1906 was only 2.41 cents per mile. (5) That complainant, in violation of the laws of the state, carried many influential people free, and that this was done to get their business or to influence them. (6) That the complainant pays exorbitant and extravagant salaries, and paid out last year large sums in settlement with persons injured on its system, or while in its employment, and large sums for lost or damaged goods, and large sums for clearing of wrecks, and large sums for advertising its business. The defendants allege that if complainant would stop selling tickets and transporting persons at less than 2¼ cents, and charge all persons 2¼ cents, the act in respect to passenger rates would not reduce the revenue of complainant as much as complainant claims.

Defendants contend that the figures given in the bill in reference to complainant's earnings are correct. They allege that the complainant was required by law to make report to the Corporation Commission, both as to its earnings and operating expenses, that such reports were made and based on such reports, and, after hearing, the General Assembly of North Carolina passed the two acts in question, and that, if the figures given in the said reports be taken as true, the complainant would be able to lose all that it claims that it would lose under the said acts, and would have a sufficient net revenue left to pay 5½ per cent. per annum upon the assessed value of that part of its property devoted to intrastate business. Defendants contend that the complainant not only earns a large revenue on its intrastate business, but considering both its intrastate and interstate business and its entire operating expenses on that part of its line lying in North Carolina, its net earnings are about 10 per cent. of the assessed value of its property.

The defendants contend that the General Assembly abolished two classes of fares, and that the result of such act would be a great sav-

ing in the operating expenses of complainant, and that the growth of the country and the greatly increased travel which would be stimulated by the reduction of rates will increase complainant's revenue without sensibly increasing its expenses. The defendants contend that, even in its reports made to the Corporation Commission, the complainant has incorrectly stated its operating expenses in making the partition between the cost of intrastate and interstate business, and, if the true rule was adopted—that is, the cost of doing intrastate and interstate business distributed proportionately—that the rates for complainant's lines would be greatly reduced below that named in the acts.

Defendants contend that the acts in question are self-executing; that none of the defendants have any special duty imposed upon them, or either of them, in reference to said acts, or either of them, and that this is a suit against the state of North Carolina, and forbidden by the eleventh amendment of the Constitution of the United States; that the laws are unconstitutional and positive in their provisions, and are self-executing, and that this suit cannot be maintained.

In considering the motion to continue the restraining order heretofore granted until the final hearing of the cause, the court is called upon to determine, first, as to whether it has jurisdiction of the parties, as well as the subject-matter of the controversy involved in this proceeding.

It is insisted by counsel for defendants that this is a suit against the state within the meaning of the eleventh amendment of the Constitution of the United States, and that, therefore, this court is without jurisdiction. Counsel cite in support of this contention the case of Fitts v. McGhee, 172 U. S. 516, 19 Sup. Ct. 269, 43 L. Ed. 535. Complainant contends that this is not a suit against the state of North Carolina. As to the Corporation Commissioners, complainant contends, in the first place, that they are charged with the duty of making the rates, both passenger and freight, for the railroad companies in North Carolina, and, even if this is not true, that they have essential duties to perform in connection with the putting into effect of the freight and passenger acts of 1907.

Complainant refers to the following statutes as applicable to the connection of the Commissioners with the rates in question:

Revisal 1905, c. 61, "Railroads," subhead 4, "Corporate Powers." Section 2567:

"General Powers. Every railroad corporation shall have power: * * * (7) Right to carry persons and property. To take and convey persons and property on its railroad by the power or force of steam, electricity or animals, or by any mechanical power, and to receive compensation therefor. * * * (9) Regulation of time and manner of transportation. To regulate the time and manner in which passengers and property shall be transported and the compensation to be paid therefor; and such compensation for any passenger and his ordinary baggage shall not exceed five cents per mile."

Section 2618:

"First and Second Class Accommodations. All railroad companies shall furnish first and second class passenger accommodations."

Chapter 20, "Corporation Commission," subhead 3, "Powers." Section 1066:

"General Powers. The Corporation Commission shall have such general control and supervision of all railroad, street railway, steamboat, canal, express and sleeping car companies or corporations and of all companies or corporations engaged in the carrying of freight or passengers, of all telegraph and telephone companies, of all public and private banks, and all loan and trust companies or corporations, and of all building and loan associations or companies, necessary to carry into effect the provisions of this chapter, and the laws regulating such companies."

## Subhead 7, "Jurisdiction." Section 1099:

"Freight and Passenger Rates. The Commission shall make reasonable and just rates:

"(1) Of freight, passenger and express tariffs for railroads, street railways, steamboats, canal and express companies or corporations, and all other transportation companies or corporations engaged in the carriage of freight, express or passengers.

"(2) For the through transportation of freight, express or passengers.

"(3) Of charges for the transportation of packages by any express company or corporation.

"(4) Of charges for the use of railroad cars carrying freight or passengers.

"(5) And rules and regulations as to contracts entered into by any railroad company or corporation to carry over its line or any part thereof the car or cars of any other company or corporation.

"(6) And shall make, require or approve what is known as 'milling-in-transit' rates on grain; or lumber to be dressed and shipped over the line of the railroad company on which such freight originated.

"(7) And, conjointly with such railroad companies, shall have authority to make special rates for the purpose of developing all manufacturing, mining, milling and internal improvements in the state.

"Nothing in this chapter shall prohibit railroad or steamboat companies from making special passenger rates with excursion or other parties, also rates on such freights as are necessary for the comfort of such parties, subject to the approval of the Commission."

## Subhead 8, "Rates."

### Section 1104:

"How fixed. In fixing any maximum rate or charge, or tariff of rates or charges for any common carrier, person or corporation subject to the provisions of this chapter the Commission shall take into consideration if proved, or may require proof of, the value of the property for such carrier, person or corporation used for the public in the consideration of such rate or charge or the fair value of the service rendered in determining the value of the property so being used for the convenience of the public. It shall furthermore consider the original cost of the construction thereof and the amount expended in permanent improvements thereon and the present compared with the original cost of construction of all of its property within the state; the probable earning capacity of such property under the particular rates proposed and the sum required to meet the operating expenses of such carrier, person or corporation and all other facts that will enable them to determine what are reasonable and just rates, charges and tariffs."

### Section 1106:

"Revision of Rates. The Commission shall from time to time, and as often as circumstances may require, change and revise or cause to be changed and revised any schedules of rates fixed by the Commission, or allowed to be charged by any carrier of freight, passengers, or express, or by any telegraph or telephone company."

### Section 1109:

"Published. All carriers shall, whenever required by the Commission, file with it a schedule of their rates of charges for freight and passengers, and

the Commission is authorized and required to publish the rates, or a summary thereof, in some convenient form for the information of the public, and quarterly thereafter the changes made in such schedules if they deem it advisable."

Section 1112:

"Schedule of Rates, Evidence. The schedule containing rates fixed by the commission shall, in suits brought against any company wherein is involved the charges of any company for the transportation of any passenger or freight or cars or unjust discrimination in relation thereto, be taken in all courts as prima facie evidence that the rates therein fixed are just and reasonable rates of charges for the transportation of passengers and freights and cars upon the railroads. All such schedules shall be received and held in all suits as prima facie evidence, the schedules of the commission without further proof than the production of the schedules desired to be used as evidence, with a certificate of the clerk of the commission that the same is a true copy of the schedule prepared or approved by it for the railroad company or the corporation therein named."

## Subhead 4, "Appeals."
Section 1078:

"Rates Vacated Pending Appeal, How. The rates of freight and fare fixed by the Commission shall be and remain the established rates and shall be so observed and regarded by corporations appealing until the same shall be changed, reversed or modified by the judgment of the superior court, unless the railroad company shall within fifteen days file with said Commission a justified undertaking, in a sum to be fixed by the Commission, conditioned to pay the state of North Carolina the difference between the aggregate freights charged or received and those fixed by said Commission and to make a report of freight charged or received, every three months during the pendency of such appeal; and whenever such difference in freight equals or exceeds the penalty of such undertaking the Commission may require another to be executed and filed with them. From the time the undertaking first mentioned is filed the judgment appealed from shall be vacated; but a failure for ten days to file any additional undertaking required by the Commission shall eo instanti revive such judgment. Out of the funds paid into the state treasury under this section there shall be refunded to shippers the overpaid freight ascertained by the final determination of the appeal on the recommendation of the commission, if application therefor is made within one year from such final determination."

## Subhead 5, "Injunction."
Section 1082:

"When granted. Bond. No judge shall grant an injunction, restraining order or other process staying or affecting, during the pending of any appeal the enforcement of any determination of the Corporation Commission fixing rates or fares, without requiring as a condition precedent the executing and filing with the Corporation Commission of a justified undertaking in the sum of not less than twenty-five thousand dollars for any company whose road is of less length than fifty miles, and fifty thousand dollars for any company whose road is over fifty miles in length, conditioned that the company will make and file with the Corporation Commission a sworn statement every three months during the pending of the appeal of the items of freight, with names of shippers, carried over such company's road within the preceding ninety days, showing the freight charged and those fixed by the Corporation Commission; and in the event the determination of the Corporation Commission appealed from is affirmed in part or in whole such company shall within thirty days pay into the treasury of North Carolina the aggregate difference between the freight collected and those fixed by the final determination of the matter appealed."

Subhead 6, "Penalties."

Section 1086:

"For Violating Rules. If any railroad company doing business in this state by its agents or employees shall be guilty of a violation of the rules and regulations provided and prescribed by the Commission, and if after due notice of such violation given to the principal officers thereof, if residing in the state, or, if not, to the manager or superintendent or secretary or treasurer if residing in the state, or if not then to any local agent thereof, ample and full recompense for the wrong or injury done thereby to any person or corporation as may be directed by the Commission shall not be made within thirty days from the time of such notice, such company shall incur a penalty for each offense of five hundred dollars."

Section 1087:

"Refusing to obey orders of Commission. Any railroad or other corporation which violates any of the provisions of this chapter or refuses to conform to or obey any rule, order or regulation of the Corporation Commission shall, in addition to the other penalties prescribed in this chapter, forfeit and pay the sum of five hundred dollars for each offense, to be recovered in an action to be instituted in the superior court of Wake county, in the name of the state of North Carolina on the relation of the Corporation Commission; and each day such company continues to violate any provision of this chapter or continues to refuse to obey or perform any rule, order or regulation prescribed by the Corporation Commission shall be a separate offense."

Section 1092:

"An action for the recovery of any penalty under this chapter shall be instituted in the county in which the penalty has been incurred, and shall be instituted in the name of the state of North Carolina on the relation of the Corporation Commission against the company incurring such penalty; or whenever such action is upon the complaint of any injured person or corporation, it shall be instituted in the name of the state of North Carolina on the relation of the Corporation Commission upon the complaint of such injured person or corporation against the company incurring such penalty. Such action shall be instituted and prosecuted by the Attorney General or the Solicitor of the judicial district in which such penalty has been incurred, and the judge before whom the same is tried shall determine the amount of compensation to be allowed the Attorney General or such solicitor prosecuting said action for his services, and such compensation so determined shall be taxed as a part of the cost. The procedure in such actions, the right of appeal and the rules regulating appeals shall be the same as are now provided by law in other civil actions."

The freight rate act contains no clause repealing prior laws. The passenger rate act contains no repealing clause except section 6, which expressly repeals section 2618 of the Revisal of 1905 (which provides for first and second class passenger accommodations). This section also repeals "all laws and clauses of laws in conflict with this act." In other words, it is insisted by complainant that at the date of the passage of the act in question the laws of North Carolina contained ample provision for the control and supervision of railroads by the Corporation Commission, and that such Commission was fully empowered to inquire into and determine what rates should be charged by the various railroad companies operating their lines in the state; that the act of 1907, in so far as the freight rate act is concerned, contains no provision repealing laws that were in existence at that time; that the passenger rate act only contains a clause repealing section 6, which expressly repeals section 2618 of the Revisal of 1905; that under these

circumstances all laws then in existence, not inconsistent with the act of 1907, are still in force as a part of the laws relating to the management and control of railroads in that state.

The rule by which the court is governed in ascertaining what part of a prior statute is repealed by a later one is laid down by the Supreme Court of North Carolina in the following language:

"A statute will not be construed as repealing a prior one on the same subject (in the absence of express words to that effect), unless there is an irreconcilable repugnancy between them, or unless the new law is evidently intended to supersede the prior one upon the subject, and to comprise in itself the sole and complete system of legislation on that subject. Black on Interpretation of Laws, 112; Endlich on Interpretation of Statutes, 210; Sutherland on Statutory Construction, § 138. The two acts now being construed being affirmative, and the subject being such that both may stand together, they both should have concurrent efficacy (1 Blk. 90) unless they be repugnant or inconsistent, or it should appear that the Legislature intended to cover the whole subject embraced in both and to prescribe the only rule in respect of that subject in the later act." College v. Lacy, 130 N. C. 364, 41 S. E. 934.

It is well settled that a repeal by implication is not favored. Jones v. Insurance Co., 88 N. C. 499; Greensboro v. McAdoo, 112 N. C. 360, 17 S. E. 178; State v. Monger, 111 N. C. 675, 16 S. E. 229; State v. Snow, 117 N. C. 774, 23 S. E. 322.

Section 1 of the passenger rate act of 1907 is as follows:

"No railroad company doing business as a common carrier of passengers in the state of North Carolina, except as hereinafter provided, shall charge, demand or receive for transporting any passenger and his or her baggage, not exceeding in weight two hundred pounds, from any station on its railroad in North Carolina to any other station on its railroad in North Carolina, a rate in excess of two and one-quarter cents per mile, and for transporting children twelve years of age or under one-half the rate described," etc.

Then follows a proviso giving to the Corporation Commission the power to exempt certain railroads from the operation of the statute, and to permit them to charge a higher rate.

The foregoing provisions in section 1 do not undertake to make the rate of passenger charges, but simply to fix a maximum limit, so that the effect of section 1 is to substitute "two and one-quarter cents per mile, and for transporting children twelve years of age and under, one-half of the rate above described" in place of the word "five" in line 4 of subsection 9 of section 2567 of the Revisal of 1905, and also to provide that at least 200 pounds of baggage shall be carried for each passenger without extra charge. Under subsection 9 of section 2567, railroad companies had the right to make the compensation for their services within the limit of five cents per mile, which was fixed as the maximum by the section in question. However, the court is of opinion that this subsection repealed by implication subsection 1 of section 1099 of the Revisal of 1905 (passed in 1899), which imposed upon the Commission the duty of making rates for freight and passenger service on railroads, thus taking the power to make rates from the railroads. Subsection 9 of section 2567 has now been expressly repealed by section 7 of the act of March 11, 1907 (chapter 469, p. 675, Pub. Laws 1907), which act is entitled, "An act to extend and enlarge the powers of North Carolina Railroad Commission." Therefore it necessarily follows that the power of making railroad rates still rests upon the

Commission, and that the acts sought to be restrained are not self-executing. The act of March 11th shows that the Legislature clearly intended that all of the acts concerning railroad rates should be considered as being part of the law relating to the subject.

It is proper to consider a repealed statute in arriving at a proper construction of the several acts. Wilson v. Jordan, 124 N. C. 638, 33 S. E. 139.

The Commission has, of course, no right to establish and publish rates higher than those allowed in the act of 1907, yet, within that limit the power and duty devolves upon it, and upon it alone, to make rates for railroad companies. The duty of the Commission to make rates for railroad companies subject to the limitation contained in the act of 1907 is imposed by section 1106 of the Revisal of 1905, which provides:

"The Commission shall from time to time, and as often as circumstances shall require, change and revise or cause to be changed or revised, any schedule of rates fixed by the Commission or allowed to be charged by any carrier of freight, passenger, express or by any telegraph or telephone company."

As an illustration, suppose that after an investigation by the Corporation Commission, under the authority conferred upon it by the statute of the state, and in the performance of the duty therein imposed, it should appear that a flat rate of two cents a mile or less would be a reasonable and just rate, could it be contended that under the provision of the foregoing section the Commission would not have the right to "change and revise or cause to be changed or revised" the rates as now established by law? In establishing rates the Commission is governed and controlled by the provisions of section 1104 quoted, and as stated, cannot make rates higher than those provided for in the statutes of 1907; yet the duty devolves upon it to say what shall be just and reasonable rates, within the maximum prescribed by the Legislature. If this be a proper construction of the act, it makes one harmonious whole, and thus gives force and effect to every statute relating to the subject in accordance with the intention of the Legislature, which, the court is of opinion, was that the Commission might make rates lower than 2¼ cents, except as to certain roads. In this view of the law, the Corporation Commissioners are charged with a duty in connection with the enforcement of the act of 1907, and are therefore proper parties to this suit.

Even if it were conceded that railroad rates can be established other than by the Commission, yet the complainant contends that the Commission is specially charged with important duties in connection with the enforcement of the acts in question by the laws of North Carolina; that, among other things, it is the duty of the Corporation Commission to take necessary steps to secure the enforcement of section 4, which provides for the prosecution of penalty suits against the complainant for a failure to comply with the provisions of section 1, and likewise, to prosecute its agents and employés for a failure on their part to comply with that section. As to the freight rate act, it is not seriously contended by the defendants that that act can go into effect in the

absence of action on the part of the Commission, since section 1 of that act provides:

"That the Corporation Commission, created by the laws of North Carolina shall not, in fixing the maximum rates and charges, or tariff of rates or charges for any common carrier transporting freight in North Carolina permit or allow any such common carrier to charge, collect or receive a greater toll, charge or rate for the transportation of any article of freight or commodity embraced in the present classification and prescribed," etc.

And section 5 of the act provides that:

"The Corporation Commission is hereby directed to prepare and publish a tariff of rates, charges and tolls, to be charged and collected by railroad companies in this state, as authorized by this act, on or before the first day of July, one thousand nine hundred and seven."

The foregoing provisions are important, and should be considered as bearing directly upon the question as to whether the court, independently of the provisions hereinbefore referred to, does not have jurisdiction.

The defendants' counsel rely upon the case of Fitts v. McGhee, 172 U. S. 516, 19 Sup. Ct. 269, 43 L. Ed. 535, as before stated, to sustain their contention that this is a suit against the state. In that case the Memphis & Charleston Railroad owned the Florence Bridge, under an act of the Legislature of the state of Alabama passed in 1895. It was provided what should be charged as maximum tolls on that bridge, and it was also provided that any one charging more should be subject to a penalty of $20, to be sued for in a court of a justice of the peace. In that case no state officer was charged with the performance of any duty in connection with the enforcement of the act. There was nothing in the act which required the Attorney General or the Governor to perform any duty in connection with the execution or enforcement of the same. When that act was passed, the cases of Samuel Thomas v. Memphis & Charleston Railroad Company and Central Trust Company of New York v. Memphis & Charleston Railroad Company were pending in the court below; and on the 14th day of February, 1895, Charles M. McGhee and Henry Fink, receivers of the Memphis & Charleston Railroad in those causes, having first obtained leave to do so, filed a bill in the name of themselves and the Railroad Company against "the state of Alabama, William C. Oates, as Governor of the state of Alabama, and William C. Fitts, as Attorney General of the state of Alabama." In the meantime a discontinuance was taken as to the Governor and the state of Alabama, and the cause was proceeded with against the Attorney General and the Solicitor of the Eleventh judicial circuit of Alabama. In a very able and exhaustive opinion delivered by Mr. Justice Harlan in that case it was held by the Supreme Court that neither the Attorney General of Alabama nor the Solicitor of the Eleventh judicial circuit of that state were charged by law with any special duty in connection with the enforcement of the act of February 9, 1895. The act of the Legislature in that instance was self-executing, and to all intents and purposes was as much an independent and general law of the state as any of the statutes enacted by the Legislature. Under such circumstances, the only possible means by which the constitutionality of such an act could have been tested would have been by taking an appeal or writ of error from a judgment rendered

thereon to the Supreme Court of the state, where, if it appeared, that a federal question was necessarily involved, or passed upon by the court, thence to the Supreme Court of the United States.

In that case Mr. Justice Harlan said:

"It is to be observed that neither the Attorney General of Alabama nor the Solicitor of the Eleventh judicial circuit of the state appear to have been charged by law with any special duty in connection with the act of February 9, 1895. In support of the contention that the present suit is not one against the state, reference was made by counsel to several cases, among which were Poindexter v. Greengow, 114 U. S. 270, 5 Sup. Ct. 903, 29 L. Ed. 185, Allen v. Baltimore & Ohio R. Co., 114 U. S. 311, 5 Sup. Ct. 925, 29 L. Ed. 200, Pennoyer v. McConnaughy, 140 U. S. 1, 11 Sup. Ct. 699, 35 L. Ed. 363, In re Tyler, 149 U. S. 164, 13 Sup. Ct. 785, 37 L. Ed. 689, Reagan v. Farmers' Loan & Trust Co., 154 U. S. 362, 388, 14 Sup. Ct. 1047, 38 L. Ed. 1014, Scott v. Donald, 165 U. S. 58, 17 Sup. Ct. 265, 41 L. Ed. 632, and Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819. Upon examination, it will be found that the defendants in each of those cases were officers of the state, specially charged with the execution of a state enactment alleged to be unconstitutional, but under the authority of which, it was averred, they were committing or about to commit some specific wrong or trespass to the injury of the plaintiff's rights. There is a wide difference between a suit against individuals holding official positions under a state to prevent them, under the sanction of an unconstitutional statute, from committing by some positive act a wrong or trespass, and a suit against officers of a state merely to test the constitutionality of a state statute, in the enforcement of which those officers will act only by formal judicial proceedings in the courts of the state. In the present case, as we have said, neither of the state officers named held any special relation to the particular statute alleged to be unconstitutional."

The learned justice clearly states the distinction between the case of Fitts v. McGhee and the one now under consideration. There is a manifest distinction between that case and the case at bar. In this case it appears that the members of the Corporation Commission of North Carolina are "specially charged" with the performance of duties in connection with the enforcement of the act of the Legislature of that state. Likewise, the Attorney General is charged with the performance of a duty in connection therewith.

Section 1066 of the Revisal of North Carolina of 1905 is as follows:

"The Corporation Commission shall have such general control and supervision of all railroads, street railway, steamboat, canal, express and sleeping car companies or corporations and of all other companies and corporations engaged in the carrying of freight and passengers, of all telegraph and telephone companies, of all public and private banks and all loan and trust companies or corporations, and of all building and loan associations or companies, necessary to carry into effect the provisions of this chapter, and the laws regulating such companies." Pub. Laws 1899, p. 291, c. 164, § 1; Pub. Laws 1901, p. 912, c. 679.

Section 1113 of the same chapter is as follows:

"The Commission, whenever in its judgment any corporation has violated any law, shall give notice thereof in writing to such corporation, and, if the violation or neglect is continued after such notice shall forthwith present the facts to the Attorney General, who shall take such proceedings thereon as he may deem expedient." Pub. Laws 1899, p. 291, c. 164, § 8.

Section 5380, c. 115, end of chapter 7, of the same Revisal, is as follows:

"It shall be the duty of the Attorney General:

"(1) To defend all actions in the Supreme Court in which the state shall be interested, or is a party, and also when requested by the Governor or either

branch of the General Assembly to appear for the state in any other court or tribunal, in any cause or matter, civil or criminal, in which the state may be a party or interested.

"(2) At the request of the Governor, Secretary of State, Treasurer, Auditor, Corporation Commissioners, Insurance Commissioner, or Superintendent of Public Instruction, he shall prosecute and defend all suits relating to matters connected with their departments.

"(3) To represent all state institutions, including the state's prison, whenever requested so to do by the official head of any such institution.

"(4) To consult with and advise the solicitors when requested by them in all matters pertaining to the duties of their office.

"(5) To give, when required, his opinion upon all questions of law submitted to him by the General Assembly, or by either branch thereof, or by the Governor, Auditor, Treasurer, or any other state officer."

Section 2 of the act of 1907 (Pub. Laws 1907, p. 251, c. 216), relating to passenger rates, is as follows:

"In the case that any railroad company operating as a common carrier of passengers in the state of North Carolina is owned, controlled or operated by any other railroad company doing business in this state, the rate for carrying passengers thereon as prescribed in this act shall be determined for said railroad by the rate prescribed by this act for the railroad company which owns, controls or operates the same; and the North Carolina Corporation Commission shall publish the rates fixed by this act for the several railroad companies operating in this state, on or before the first day of June 1907."

It is also, among other things, provided in section 1, as follows:

"Provided that the Corporation Commission of North Carolina is hereby authorized and empowered to permit all independently owned and operated railroads in North Carolina whose mileage in said state is sixty miles or under to charge a rate for transporting passengers not in excess of the present rate fixed and prescribed for said road and also permit all railroads constructed within twelve months preceding the first day of January 1907, or at that time in course of construction for a term of two years from and after July first 1907, and also all such railroads as may be constructed within two years from January first, 1907, to charge such rate in excess of the rate above prescribed as the said Commission may determine to be reasonable."

Section 2 makes it the duty of the Commission to determine whether a road is controlled or operated by another railroad, and, when that is done, the rate must be determined and published.

It is insisted by counsel for defendants that there is nothing in the act of the Legislature of 1907 which specially charges the Corporation Commission or the Attorney General with the enforcement of such act. This contention, in so far as it relates to passenger rates, with the exception of section 2 of the act, is undoubtedly true. Notwithstanding that such is the case, it must be borne in mind that sections 1066, 1113, 5380, chapter 15, and subdivisions, were a part of the general law relating to the management and control of railroads in North Carolina, and were in full force and effect at the date of the passage of the act in question, and still remain undisturbed as a part of the law applicable to the subject under consideration. Under the well-established rule of construction, these sections must be construed as forming a part of the law relating to the enforcement of any legislation that may have been enacted in regard to the subject fixing maximum rates.

In the case of Wilson v. Jordon, 124 N. C. 683, 33 S. E. 139, the court, in discussing this phase of the question, said:

"All acts of the same session of the Legislature upon the same subject-matter are considered as one act, and must be construed together, under the doctrine of 'in pari materia.' State v. Bell, 25 N. C. 506; Black, Interp. Laws, 86; Eng. Interp. Laws, § 45; Cain v. State, 20 Tex. 355. They should be considered in pari materia, whether passed at the same session or not. Simonton v. Lanier, 71 N. C. 498; Rhodes v. Lewis, 80 N. C. 136. Where a former act has been repealed or has expired by its limitation, when it is in pari materia, it must be considered in connection with the last act, and, if necessary, a part of it. Potter, Dwar. p. 190. 'It certainly appears strange,' said Williams, J., in a late case, 'that, when an act of Parliament is per se abolished, it shall virtually have effect through another act. But in that case the former act was substantially re-enacted. Reg. v. Merionethshirs, 6 Adol. & Ellis, 343. It does, indeed, seem to be the prevailing doctrine (and it is more rational in itself than consistent with coeval maxims) that, where one statute refers to another which is repealed, the words of the former act must still be considered as if introduced into the latter statute.' Potter, Dwar. p. 192."

In Rex v. Laxdale, 1 Burrows, 445, it is held (Lord Mansfield delivering the judgment of the court):

"That where there are different statutes in pari materia, though made at different times, or even where they have expired, and not referring to each other, they shall be taken and considered together as one system, and as explanatory of each other."

The same doctrine is held in New York. Smith v. People, 47 N. Y. 330, which is very much in point.

Therefore the sections which refer to the supervision and control of railroads by the Corporation Commission, when read in connection with the act of 1907, as the same should be, it appears that the members of the Corporation Commission, as well as the Attorney General, are charged with the duty of securing the enforcement of the provisions of the act of 1907, and it is made their special duty to secure the enforcement of the provisions of section 4 of the passenger act; hence it necessarily follows that they are proper parties to this proceeding. This conclusion is sustained by the principles enunciated in the case of Smyth v. Ames, 169 U. S. 466–70, 18 Sup. Ct. 418, 42 L. Ed. 819. Prior to the enactment of the statute of the state of Nebraska to "regulate railroads, classify freight, to fix reasonable maximum rates to be charged for the transportation of freight upon each of the railroads of the state and to provide penalties for the violation of this act," the Legislature passed an act to regulate railroads, to prevent unjust discrimination, to provide a board of transportation and define its duty, etc. By this act the Attorney General, Secretary of State, the Auditor of Public Accounts, State Treasurer, and Commissioner of Public Lands and Buildings were constituted a board of transportation, with power to appoint three secretaries to assist it in the performance of its duties, and with authority to inquire into the management of the business of all common carriers subject to its provisions, and obtain from such carriers full and complete information necessary to enable the board thus established to perform its duties and to carry out the objects for which it was created. Thus it will be seen that the Attorney General in that instance was not charged with the performance of any specific duty in regard to the enforcement of the rates in the state of Nebraska by the act which undertook to fix maximum rates, but that

duty was imposed upon him as a member of the board of transportation by the provisions of a law which had been enacted prior to the passage of the act fixing rates, and that case is therefore on all fours with the case at bar.

In the case of Prout v. Starr, 188 U. S. 542, 23 Sup. Ct. 400, 47 L. Ed. 584, the court upheld a suit against the board of transportation and Attorney General of Nebraska arising out of the same statute involved in Smyth v. Ames, and, in discussing the matter, employed the following language:

"But by this appeal we are asked to declare that the Circuit Court had no jurisdiction because it appears, on the face of the bill, that the complaint is essentially against the state of Nebraska, and. is in contravention of the eleventh amendment of the Constitution of the United States. It is a sufficient answer to this contention that it was made, considered, and determined in Smyth v. Ames. In the opinion in that case it was said: 'Within the meaning of the eleventh amendment of the Constitution, these suits are not against the state, but against certain individuals charged with the administration of a state enactment, which, it is alleged, cannot be enforced without violating the constitutional rights of the plaintiffs. It is the settled doctrine of this court that a suit against individuals, for the purpose of preventing them as officers of a state from enforcing an unconstitutional enactment to the injury of the rights of the plaintiff, is not a suit against the state within the meaning of that amendment. Pennoyer v. McConnaughy, 140 U. S. 1, 11 Sup. Ct. 699, 35 L. Ed. 363; In re Tyler, 149 U. S. 164, 190, 13 Sup. Ct. 785, 37 L. Ed. 689; Scott v. Donald, 165 U. S. 58, 68, 17 Sup. Ct. 265, 41 L. Ed. 632; Tindal v. Wesley, 167 U. S. 204, 220, 17 Sup. Ct. 770, 42 L. Ed. 137.'"

Suits and injunctions against the Attorney General of a state have been upheld in the recent cases of Railroad Commission of Louisiana v. Texas & Pacific Company, 144 Fed. 68, 75 C. C. A. 226, and Consolidated Gas Company v. Mayer (C. C.) 146 Fed. 150, 154. In the latter case it appears that the duty of the Attorney General with respect to the enforcement of the statute existed by virtue of his general duties imposed by a separate and antecedent statute.

In the case of Mississippi Railroad Company v. Illinois Central Railroad Company, 203 U. S. 335, 340, 27 Sup. Ct. 90, 93, 51 L. Ed. 209, the court, among other things in discussing this question, said:

"The Commission was created by the state of Mississippi under the authority of its Constitution and laws for the purpose of supervising, and, to some extent, controlling, the acts of the railroads operating within the state. Such a commission is subject to a suit by a citizen. Reagan v. Farmers' Loan & Trust Co., 154 U. S. 363, 14 Sup. Ct. 1047, 38 L. Ed. 1014; Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819; Prout v. Starr, 188 U. S. 537, 23 Sup. Ct. 398, 47 L. Ed. 584."

In the case of Reagan v. Farmers' Loan & Trust Co., 154 U. S. 362, 14 Sup. Ct. 1047, 38 L. Ed. 1014, the Attorney General and the Railroad Commission of Texas were enjoined from the enforcement of the act. In that case it was strenuously insisted that it was a suit against the state, and therefore in violation of the eleventh amendment of the Constitution of the United States. The Circuit Court, as well as the Supreme Court, held otherwise.

The Texas statute relating to the same (Gen. Laws Texas, 1853, c. 51) reads as follows:

"Sec. 18. If any railroad, as aforesaid shall wilfully violate any other provisions of this act, or shall do any other act herein prohibited, or shall fail or refuse to perform any other duty enjoined upon it for which a penalty has not herein been provided, for every such act of violation it shall pay the state of Texas a penalty of not more than five thousand dollars.

"Sec. 19. All of the penalties herein provided, except as provided in section 17, shall be recovered and suits thereon shall be brought in the name of the state of Texas in the proper court having jurisdiction thereof in Travis county * * * by the Attorney General or under his direction; and the attorney bringing such suit shall receive a fee of fifty dollars for each penalty recovered and collected, by him, and ten per cent of the amount collected, to be paid by the state. * * * All fines and penalties recovered by the state under this act shall be paid into the treasury of the state. * * * "

"Sec. 21. It is hereby made the duty of such Railroad Commission to see that the provisions of this act and all laws of this state concerning railroads are enforced and obeyed, and that violations thereof are promptly prosecuted, and penalties due the state therefor are recovered and collected. And said Commission shall report all such violations with the facts in their possession to the Attorney General or any other officer charged with the enforcement of the laws, and request him to institute the proper proceedings. * * *

(a) It shall be the duty of the Commission to investigate all complaints against railroad companies subject hereto and to enforce all laws of this state in reference to railroads."

Section 1113 of the Revisal of North Carolina of 1905 provides that the Commission, whenever in its judgment any corporation has violated any law, shall first give notice of such violation to the offending corporation, and, in the event of a failure on the part of such corporation to comply with the law, "shall forthwith present the facts to the Attorney General, who shall take such proceedings thereon as he may deem expedient."

This provision is positive, and must be construed as being mandatory. In this case the statute of North Carolina makes it clearly the duty of the Attorney General, when called upon, to prosecute any suit or action which may be deemed necessary to secure the enforcement of the laws of the state, in regard to the fixing of maximum rates. This section, when construed in accordance with the rule laid down in the Reagan and Ames Cases, clearly charges the Attorney General with a duty in relation to the enforcement of the act in question.

In this connection, it is well to consider the scope and meaning of the expression "specially charged with the execution of a state enactment." The Supreme Court in the Reagan Case, as well as the Ames Case, expressly held that the officers enjoined in those cases were state officers, "specially charged with the execution of a state enactment." From what appears in those cases, it necessarily follows that the words "specially charged" are not to be construed to mean that the Attorney General cannot be enjoined except in cases where the state statute has expressly commanded him to enforce the act by bringing suits for penalties or prosecuting misdemeanors mentioned in the act. He was only charged by his general duty as the law officer of the state, and yet he was enjoined in language so broad as to include every attempt to enforce the penalties attending the violation of "House Roll 33." In the Reagan Case the Attorney General was not deprived of his discretion and reduced to a mere ministerial agent, as will appear by an examination of the Texas statute. Likewise, an examination of the Ne-

braska statute of 1887 and the re-enactment of it into the Revised Statutes of Nebraska of 1893 (chapter 72, art. 8, §§ 1–23) fails to show that the Nebraska State Board of Transportation was in any way directed to enforce by criminal procedure the act of 1887 or any other act. It was held in that case that the Attorney General of Nebraska was specially charged with the enforcement of the penal clause of the act of 1893 (Laws 1893, p. 164, c. 24), relating to the maximum rate law, known as "House Roll 33," merely because the law of 1893 imposed a penalty for the violation of the maximum rate law. When we come to consider the statutes of North Carolina, we find that to construe the same in accordance with the principles laid down in the Reagan Case, Smyth v. Ames, Consolidated Gas Company v. Mayer, that the Corporation Commission and the Attorney General of North Carolina are specially charged with the enforcement of the acts of 1907.

It is inconceivable that a Circuit Court of the United States, in the exercise of its jurisdiction, should be powerless to afford a remedy to one who seeks to assert a right which is guaranteed by the Constitution of the United States. This is in no sense a suit against the state, nor can it be successfully contended that the state is in anywise a party in interest, in so far as the merits of the controversy are concerned. It cannot be reasonably insisted that this is a suit to prevent the state from enforcing any right which it possesses, nor can it be said to be a suit to compel the performance of an obligation of the state, nor does it in anywise involve a matter in which the state has a pecuniary interest; the parties in interest being the complainant on the one side, and the traveling public on the other. Therefore the questions presented are not such as to warrant the assumption that this court is without jurisdiction, and a careful study of the circumstances attending the adoption of the eleventh amendment, as well as the end to be obtained by the adoption of the same, show conclusively that those who were responsible for its adoption never dreamed that it could be used as a means of depriving an American citizen of a substantial right conferred upon him by the Constitution of the United States. The eleventh amendment, being a part of the Constitution of the United States, must be construed so as to give full force and effect to each and every provision of the instrument of which it forms a part. Any other construction of this amendment would practically nullify that clause of the Constitution which provides that no state shall pass any laws impairing the obligation of contracts, as well as the fourteenth amendment, which, among other things, provides that:

"No state shall make or enforce any law which will abridge the privileges or immunities of citizens of the United States, nor shall any state deprive any person of life, liberty or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

It cannot be that a state Legislature can so frame an act as to deprive a citizen of a right vouchsafed to him by the Constitution of the United States, and it is equally unreasonable to contend that a state Legislature possesses the power by legislative enactment to deprive this court of its jurisdiction; and the sooner these questions are definitely determined the better it will be for all parties concerned.

That there is a disposition on the part of some to do that, which, if successful, would not only impair the usefulness of the federal courts, but nullify certain provisions of the Constitution, is apparent. This situation is productive of a feeling of unrest and a lack of confidence on the part of the people in the ability of the United States courts to fairly administer the law in accordance with the Constitution.

For the reasons stated, the court is of opinion that this is not a suit against the state within the meaning of the eleventh amendment, and that, therefore, it has jurisdiction to hear and determine the issues raised by the pleadings.

It is charged in the bill that, if the proposed rates are enforced, complainant will suffer irreparable injury, that such rates are unreasonable, unjust, and confiscatory, and that the complainant is about to be deprived of its property without due process of law, and, as a means of having its rights determined in an orderly and judicial way, it comes into a court of equity, and asks that an order be granted restraining the enforcement of the provisions of the act of 1907 until the final hearing of the cause. The complainant insists that it should be protected against the irreparable injury it would sustain if the proposed rates should be put into effect pending the final hearing of the original suit in this cause. Among other things, it is alleged that the Legislature of North Carolina at its recent session passed acts regulating freight and passenger rates, and that, by virtue of the provisions of said acts, it is about to be deprived of its property without due process of law, and also denied the equal protection of the laws. The complainant seeks to enjoin the enforcement of the rates prescribed by the act in question upon the ground that the statute prescribing the same is repugnant to the Constitution of the United States. It is contended that the lapse of any considerable length of time would expose it to innumerable suits by shippers and the traveling public for penalties, as well as subject it to the penalties prescribed by the statute. Complainant prays for an injunction against the Corporation Commissioners, the Attorney General, and the Assistant Attorney General during the pendency of this cause.

On the 8th day of May, 1907, an order was entered restraining the defendants from enforcing the aforesaid act, and at that time notice was issued to the defendants to appear on the 28th day of June, 1907, and show cause why the injunction thus granted should not be continued until the final hearing. In considering this motion it is incumbent upon the court, in the exercise of its discretion, to determine whether, under the circumstances, the complainant is entitled to the relief which it seeks, and also whether it will suffer irreparable injury in the event the court should refuse to continue the injunction until the final hearing. That it is the duty of a court of equity to restrain the enforcement of an act which is alleged to be unconstitutional, when it is shown by the proof that the complainant will, pending a final hearing, suffer irreparable injury, is a well-established rule of such courts. In such cases the court, in order to avoid a multiplicity of suits, will restrain the enforcement of any act with respect to the same until the final hearing. In discussing this phase of the question, the learned

justice who delivered the opinion in the case of Smyth v. Ames, supra, said:

"In these cases the plaintiff stockholders in the corporations named ask a decree enjoining the enforcement of certain rates for transportation upon the ground that the statute prescribing them is repugnant to the Constitution of the United States. Under the principles which in the federal system distinguished cases in law from those in equity, the Circuit Court of the United States, sitting in equity, can make a comprehensive decree covering the whole ground of controversy, and thus avoid the multiplicity of suits that would inevitably arise under the statute. The carrier is made liable not only to individual persons for every act, matter, or thing prohibited by the statute, and for every omission to do any act, matter or thing required to be done, but a fine of from $1,000 to $5,000 for the first offense, from $5,000 to $10,000 for the second offense, from $10,000 to $20,000 for the third offense, and $25,000 for every subsequent offense. The transactions along the line of any of these railroads, out of which causes of action might arise under the statute, are so numerous and varied that the interference of equity could well be justified upon the ground that a general decree, according to the prayer of the bills, would avoid a multiplicity of suits, and give a remedy more certain and efficacious than could be given in any proceeding instituted against the company in a court of law; for a court of law could only deal with each separate transaction involving the rates to be charged for transportation. The transactions for a single week would expose any company questioning the validity of the statute to a vast number of suits by shippers, to say nothing of the heavy penalties named in the statute. Only a court of equity is competent to meet such an emergency, and determine, once and for all and without a multiplicity of suits, matters that affect, not simply individuals, but the interest of the entire community as involved in the use of a public highway and in the administration of the affairs of the quasi public corporation by which such highway is maintained."

It is well to remember that the allegations in the bill filed by complainant are in many respects similar to those contained in the bill filed in that case.

In the case at bar it is shown that section 4 of the act prescribes heavy and unusual penalties, the enforcement of which, for any considerable length of time in a court of law, would practically bankrupt the complainant.

In addition to the allegations contained in the verified bill, the complainant has offered the affidavit of A. H. Plant, comptroller of complainant, as to the amount of its intrastate as contradistinguished from its interstate business.

Among other things, Mr. Plant says:

"That he is, and for some years past has been, comptroller of the Southern Railway Company, and as such has supervision over its accounts, and charge of its books, and that the following is a true statement of the results of operation of Southern Railway Company in North Carolina during the year ending June 30, 1906, under the rates and classifications existing at that time:

Gross earnings from operation in North Carolina, including
   both interstate and intrastate........................$12,043,727 33
Operating cost to earn one dollar of intrastate revenue in
   North Carolina was not less than......................        86 35

"While it is impossible to state the exact cost to earn a dollar of intrastate revenue, it is certain that it cost much more than the average cost to do all business, and at least the above mentioned figures, as this affiant verily believes.

"Gross earnings in North Carolina from intrastate traffic:

| | |
|---|---|
| From passengers............................................$ | 1,565,695 33 |
| From freight................................................ | 1,322,564 30 |
| From mail.................................................,...... | 230,383 78 |
| From express............................................... | 169,474 89 |
| From miscellaneous........................................ | 36,507 44 |

Total gross revenue from intrastate traffic in North Carolina for said year....................................... 3,324,625 74

Minimum expense of earning this gross intrastate revenue, on the basis of $86.35 to earn one dollar................ 2,870,814 33

Maximum net earnings from intrastate traffic in North Carolina for said year, without allowing for taxes...... 453,811 41

Taxes chargeable to North Carolina for the fiscal year ended June 30, 1906, were................................ 269,651 18

The proportion of intrastate gross earnings to total gross earnings in North Carolina was 27.60 per cent.

27.60 per cent. of the total taxes above mentioned which should be charged to intrastate traffic shows intrastate taxes to have been for that year........................ 74,423 73

Improvements and betterments not capitalized chargeable to North Carolina during the year for the purpose of keeping the property up to modern standards and without additions to it, amounted to.......................... 197,945 81

27.60 per cent. of which is assignable to intrastate traffic, or 54,633 04

Total taxes and improvements and betterments not capitalized chargeable against intrastate traffic for said year.. 129,056 77

Leaving as the maximum net intrastate earnings in North Carolina for said year, after deducting the said proportion of taxes and the said proportion of improvements and betterments not capitalized...................... 324,754 64

Applying to the above mentioned intrastate business in North Carolina for the year ended June 30, 1906, the passenger and freight rates proposed by the acts of the legislature of North Carolina passed during March of the current year, there would have been a loss of passenger revenue of................................................ 275,055 53

And a loss in freight revenue of......................... 21,691 64

Or a total loss of..................................... 296,747 17

Making the net earnings from intrastate operations under the proposed rates and classifications.................. 28,007 47

During the said year the value of the physical properties of this company in North Carolina, according to the assessment made by the state for the purpose of taxation, was 26,134,865 00

The proportion of this tax value used for intrastate purposes should be ascertained on the basis of user, which is on the basis of the proportion of gross earnings from intrastate business to the total gross earnings from all business for said year in North Carolina, or 27.60 per cent. of the said assessed value, which amounts to......... 7,213,222 74

The maximum net revenue from intrastate traffic in North Carolina under the existing rates would only yield as interest upon said proportion of said tax value, per annum ............................................. 4.50 per cent.

Under the proposed rates and classifications the net revenue from intrastate traffic in North Carolina would only yield as interest upon the said proportion of said tax value, per annum ............................................. .39 per cent.

"The affiant further says that the foregoing results of operation in the state of North Carolina for the year ending June 30, 1906, show a larger net

result to the company than is fairly representative of the results of the company's operations in the future, for the reason that since the 30th day of June, 1906, the close of said fiscal year, there has been a ·large increase in the expenses of the company, due to increases in wages, and to the increase in·cost of all material and supplies and other expenses, as·will be shown by the following statement for the system:

For the six months ended December 31, 1906, the gross
..earnings of the company increased over the same period
  of the previous year.................................................$ 1,711,861 79
Whereas the operating expenses and taxes increased for
  the same period.............................................................. 2,623,979 77
Showing a decrease in net earnings for the six months
  mentioned, of............................................................... 912,117 98

"In addition to the foregoing increases in wages and other expenses, the company is confronted with still further very substantial demands for increases, in wages. While the above figures are for the system, a proportionate part of said increase in expenses would apply to North Carolina."

It is insisted by counsel for defendants that Mr. Plant made certain reports to the Corporation Commission which are inconsistent with the affidavit which he now makes as to local business transacted by complainant in the state of North Carolina. In an affidavit filed by Mr. Plant on the 26th of June, 1907, in referring to the reports which he had previously made to the Corporation Commission, it is said:

"As no account of the difference in such costs was kept upon the books of this company, and no attempt made in the company's books to separate the cost between the interstate and the intrastate business, when called upon for statements of these expenses by the North Carolina Commission, such statements were necessarily made upon an assumed basis, with the statement that the results were approximate. And the basis assumed for these reports in North Carolina was the minimum amount stated in the decision above referred to of the Supreme Court of the United States in Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819. Subsequent investigation and study of the situation and consultation with men of experience have convinced me that the estimated basis made in the report to the commission in North Carolina is entirely too small, and that the minimum should not be less than is given in this affidavit. In fact, when all the conditions are considered and all the elements of increased expenses are given their due weight, I believe that the estimate given in this affidavit will be considerably below what is the real cost of doing such business. It is impossible to arrive at such costs accurately, as there are many of the elements of the expense which are common to all classes of business, and a division of expenses thus common to all classes of traffic must be made more or less upon arbitrary lines. For example: The general expense of doing all the business of the company cannot, with accuracy, be allocated as between the different classes of business, and the same is true of other elements of expense, such as maintenance; but it is safe to say that a reliable minimum can be reached, and this minimum. is not, in my judgment, after much consideration of the subject, less than that above mentioned. This estimate of a minimum makes no allowance whatever for any increased cost of maintenance due to the increased wear and tear on the roadbed and equipment incident to the more frequent starts and stops in connection with intrastate business. * * * The earnings from passengers of passenger trains in North Carolina, embracing both interstate and intrastate passenger business, are less than $1 per train mile, and it is the usually accepted opinion among railroad men that a passenger train which does not earn from its passengers more than a dollar per mile is not a·profitable train, the general impression being that a passenger train earning less than $1 per train mile from passengers is run at a loss. Whether this is actually true or not, I believe it to be certain that it costs to earn

$1 of every class of passenger train revenue, intrastate as well as interstate, more than the above-mentioned figures of 86.35 cents."

When we come to consider the testimony of Mr. Plant, we find that it is true that he made certain reports to the Corporation Commission which are not strictly in accord with the affidavits which he now makes. While this is so, it is also shown by the marginal notes of the reports of the corporation commission that the same were based only on an estimate, and were not intended to be treated as matters of fact. If it had been shown that the witness had made two contradictory statements or inconsistent utterances as to matters of fact, then the question as to the veracity of the witness would arise, and under such circumstances it would be the duty of the court to consider the same in determining the weight of such testimony as bearing upon the truth or falsity of the same; but, inasmuch as these statements relate solely to a matter of opinion, no question of veracity arises, and when we consider the statements in question, together with the evidence of Mr. Plant, it cannot be said that the testimony which he now gives is calculated to impeach his character as a witness, nor can it be said that such testimony tends to contradict (in the ordinary acceptation of the term) the statements which he made to the Corporation Commission in the first instance. The one is a matter of opinion—an estimate—and may vary with the conditions of one's study and investigation, and his opinion is valuable in proportion to the amount of study and investigation that he may make with respect to the matter about which he is testifying; while, on the other hand, if he makes a contradictory statement as to a question of fact, such statement may be used for the purpose of discrediting him as a witness. Our experience in human affairs teaches us that in matters of opinion men are likely to differ materially, and such difference does not tend in the slightest degree to affect the character of one who may have given expression to conflicting opinion at different stages of an investigation of a subject, the determination of which necessarily involves calculations that are based upon estimates, and which do not depend upon facts to support the same.

The testimony of Mr. Plant is, in the main, sustained by the testimony of the following persons who have filed affidavits in this cause: Frank Ney, general auditor, Rock Island Railroad Company; Erastus Young, general auditor, Union Pacific Railroad Company; Mr. Krebs, general auditor, Illinois Central Railroad Company; H. B. Spencer, vice president of complainant company; Mr. Earling, vice president of the Chicago, Milwaukee & St. Paul Railroad Company; Mr. Truesdale, president, Delaware, Lackawanna & Western Railroad Company; Mr. Harris, president, Chicago, Burlington & Quincy Railroad Company; Mr. Wickersham, president of the Atlantic & West Point Railroad Company; Mr. Sullivan, comptroller, Chesapeake & Ohio Railroad Company. It is also shown by the affidavit of W. H. Tayloe, general passenger agent of complainant, that the rates now in force are the same which were in force during the whole of the year ended June 30, 1906, and that in no instance are such rates unjustly, unreasonably, and unfairly high, and that in no instance are such rates greater than a

reasonable compensation for the services rendered. Mr. Tayloe also states that the passenger tariff established by the act in question is unjustly, unreasonably, and unfairly low, and that the rates therein prescribed would not furnish the complainant a fair, just or reasonable compensation for the services rendered, or a reasonable or fair return on its property engaged in intrastate business; that, if the rates so established are put into effect, the revenue of complainant will be largely reduced, and there would not be a sufficient increase in passenger business to compensate the complainant for the loss of revenue resulting therefrom.

It is also insisted by counsel for complainant that in the case of Smyth v. Ames, supra, it was shown that the evidence justified 20 per cent. higher as the proper basis, and that in the case of Chicago, M. & St. Co. v. Tompkins, 176 U. S. 167, 20 Sup. Ct. 336, 44 L. Ed. 417, the contention of Mr. Plant is sustained. In the case of Smyth v. Ames, supra, the Supreme Court, in referring to the methods similar to those employed by Mr. Plant and other witnesses in this cause, said:

"The conclusion reached by the Circuit Court was that the reduction made by the Nebraska statute in the rates for local freight was so unjust and unreasonable as to require a decree staying the enforcement of such rates against the companies named in the bill. Ames v. Union Pacific Railway (C. C.) 64 Fed. 165, 189. That conclusion was based largely upon the figures presented by Mr. Dilworth while he was secretary of the State Board of Transportation, as well as a defendant and one of the solicitors of the defendants in these causes. He was a principal witness for that board. His general fairness and his competency to speak of the facts upon which the question before us depends are apparent on the record. He stated that the average reduction made by the statute on all the 'commodities of local rates' was 29.50 per cent.; and this estimate seems to have been accepted by the parties as correct. He estimated that the percentage of operating expenses on local business would exceed the percentage of operating expenses on all business by at least 10 per cent., and that it might go as high as 20 per cent. or higher. And this view is more than sustained by the evidence of witnesses possessing special knowledge of railroad transportation and of the cost of doing local business as compared with what is called through business. Indeed, one of those witnesses states that the cost of carrying local freight is four times as much as the cost of through freight per ton per mile; another that the cost of the short haul is 'reasonably double the long haul.' If due regard be had to the testimony—and we have no other basis for our judgment—we are not permitted to place the extra cost of local business at less than 10 per cent. greater than the percentage of the cost of all business."

Counsel for defendants offer no evidence to contradict the testimony produced by the complainant, save the report herein referred to as having been made by Mr. Plant to the Corporation Commission.

It is charged in the bill that the present rates were established with the approval of the Corporation Commission of North Carolina, and this allegation is uncontradicted. This circumstance, taken in connection with the fact that the Corporation Commission had before it the reports made by Mr. Plant as to the amount of complainant's intrastate business at the time the present rates were adopted, is worthy of consideration in determining the merits of this controversy, inasmuch as it appears that at the time the present rates were established it was the judgment of the Corporation Commission that a general reduction of rates could not be made without injury to complainant, and the court

is unable to find anything from the record before it to show that the situation in North Carolina has so changed since that date as to justify a change of the rates which were deemed expedient at that time.

The issue thus raised, when stripped of irrelevant and extraneous matter, presents solely the question as to whether the rates fixed by the Legislature are unjustifiably and unreasonably low in view of the amount of money invested by complainant in such intrastate business, as well as the cost of operating its lines of road, together with the necessary expenses incurred in connection therewith, which are not, technically speaking, operating expenses, yet at the same time should be considered in determining the reasonableness of the rates as being necessarily pertinent thereto. In addition to these items, should be considered taxes and payments on account of casualties and accidents. The unprecedented development and prosperity of the South at this time necessitate double tracking, as well as a general overhauling of the property of complainant, in order that it may be able to meet the demands thus occasioned. There has never been a period in the history of that section of the country when there was such an urgent demand for improved and increased railroad facilities as at the present time. What the public demands at this time is increased facilities in the way of transportation of freight and passengers, and this is especially true in western Carolina, a section of country which until 1881 was practically without railroad facilities. The development of the timber and mineral interests of this section since the completion of the Southern Railway renders it highly important that we should not only have better railroad facilities, but, in addition thereto, new lines of road constructed in order that the people of that section may be able to develop their properties. As a result of this development, it is to be presumed that there has been a large increase in the value of the real estate in that section of the country, which alone inures to the benefit of the people of such territory. It is no ordinary task to construct and operate a railroad in a mountainous region like that of western Carolina. Some of these matters at this stage of the proceeding are pertinent to the questions at issue, and are worthy of consideration.

Much has been said by counsel for defendants in regard to state sovereignty, and newspapers and state officials have undertaken to determine those questions by methods unknown to judicial procedure, and which, if permitted to prevail, would lead to demoralization of public and private business, and would be in utter disregard of the rights of individuals as guaranteed by the Constitution of the United States. In the famous case of Marbury v. Madison, 1 Cranch (U. S.) 137, 2 L. Ed. 60, Mr. Chief Justice Marshall, among other things, said:

"The government of the United States has been emphatically termed a government of laws, and not men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right. * * *"

It can never be truthfully said that there is an interference with states' rights, so long as the courts of the United States do no more than exercise the judicial power conferred upon such courts by Congress in pursuance of the Constitution of the United States. It is remarkable that any one should at this late day question the power

of the courts to declare an act of a state or federal Legislature unconstitutional when it is shown that it is repugnant to the Constitution; and it is well to remember that a North Carolina court was the first to announce the doctrine that the courts possessed such power, and soon thereafter the Supreme Court of the United States, in the case of Marbury v. Madison, supra, declared it to be the settled doctrine of this country. In the North Carolina case the Court of Conference (which was the highest court at that time), in Bayard v. Singleton, 1 N. C. Rep. 5 (Nov. Term, 1787), in discussing the power of the court to declare an act of the Legislature unconstitutional, said:

"Another mode was proposed for putting the matter in controversy on a more constitutional footing for a decision than that of the motion under the aforesaid act. The court then, after every reasonable endeavor had been used in vain for avoiding a disagreeable difference between the Legislature and the judicial powers of the State, at length with much apparent reluctance, but with great deliberation and firmness, gave their opinion separately, but unanimously for overruling the afore-mentioned motion for the dismission of the said suits, in the course of which the judges observed that the obligation of their oaths and the duty of their office required them in that situation to give their opinion on that important and momentous subject, and that notwithstanding the great reluctance they might feel against involving themselves in a dispute with the Legislature of the state, yet no object of concern or respect could come in competition or authorize them to dispense with the duty they owed the public, in consequence of the trust they were invested with under the solemnity of their oaths; that they, therefore, were bound to declare that they considered that whatever disabilities the persons under whom the plaintiffs were said to derive their title might justly have incurred against their maintaining or prosecuting any suits in the courts of this state, yet that such disabilities in their nature were merely personal, and not by any means capable of being transferred to the present plaintiffs, either by descent or purchase, and that these plaintiffs being citizens of one of the United States, or citizens of this state, by the confederation of all the states, which is to be taken as a part of the law of the land, unrepealable by any act of the General Assembly; that by the Constitution every citizen had undoubtedly a right to a decision of his property by a trial by jury, for that if the Legislature could take away this right, and require him to stand condemned in his property without a trial, it might with as much authority require his life to be taken away without a trial by jury, and that he should stand condemned to die without the formality of any trial at all; that, if the members of the General Assembly could do this, they might with equal authority not only render themselves the legislators of the state for life, without any further election of the people, from thence transmit the dignity and authority of legislation down to their heirs male forever; but that it was clear that no act they could pass could by any means repeal or alter the Constitution, because, if they could do this, they would at the same instant of time destroy their own existence as a Legislature, and dissolve the government thereby established. Consequently the Constitution (which the judicial power was bound to take notice of as much as of any other law whatever), standing in full force as the fundamental law of the land, notwithstanding the act on which the present motion was grounded, the same act must, of course, in that instance, stand as abrogated and without any effect."

That the Legislature has the power within the limitations fixed by the Constitution of the United States to prescribe maximum rates for railroads cannot be denied. While this is so, it is equally true as was said by Judge Catron (afterwards a justice of the Supreme Court of the United States), in the case of Vanzant v. Waddell, 2 Yerger (Tenn.) 262–70:

"Every partial or private law which directly proposes to destroy or affect individual rights, or does the same thing by affording remedies leading to similar consequences, is unconstitutional and void. Were this otherwise, odious individuals and corporate bodies would be governed by one rule, and the mass of the community, who made the law, by another."

In the case of Smyth v. Ames, supra, in referring to this phase of the question, it is said:

" * * * But, despite the difficulties that confessedly attend the proper solution of such questions, the court cannot shrink from the duty to determine whether it be true, as alleged, that the Nebraska statute invades or destroys rights secured by the supreme law of the land. No one, we take it, will contend that a state enactment is in harmony with that law simply because the Legislature of the State has declared such to be the case; for that would make the state Legislature the final judge of the validity of its enactments, although the Constitution of the United States and the laws made in pursuance thereof are the supreme law of the land, anything in the Constitution or laws of any state to the contrary notwithstanding. Article 6. The idea that any Legislature, state or federal, can conclusively determine for the people and for the court that which it enacts into the form of law, or what it authorizes its agents to do, is consistent with the fundamental law, is in opposition to the theory of our institutions. The duty rests upon all courts, federal and state, when their jurisdiction is properly invoked, to see to it that no right secured by the supreme law of the land is impaired or destroyed by legislation. This function and duty of the judiciary distinguishes the American system from all other systems of government. The perpetuity of our institutions and the liberty which is enjoyed under them depend, in no small degree, upon the power given the judiciary to declare null and void all legislation that is clearly repugnant to the supreme law of the land."

The complainant has invoked the jurisdiction of this court for the purpose of asserting a right which is guaranteed to it by the organic law of the land. This law is supreme, and should be obeyed until the people of the United States through their Legislatures shall deem it expedient to modify the same. Every official, state or federal, is required before entering upon the discharge of the duties of his office to take an oath to support and maintain the Constitution of the United States and the laws made in pursuance thereof, and the state official who takes this oath, among other things, is required to state that he will support the Constitution and laws of the state not inconsistent with the Constitution and laws of the United States. Under these circumstances, there can, and should be, no conflict between the state and federal courts.

If this were a suit in the state court, and it should appear, as it does in this case, that the complainant was threatened with irreparable injury, the injunction would be continued until the final hearing as a matter of course, upon the theory that it is the duty of the court to preserve the status quo until there could be a final determination of the questions involved in the controversy. This is the well-settled rule of the federal courts, and is the universal practice in the state courts of North Carolina.

Counsel for defendants cite the case of Covington & Co. v. Sanford, 164 U. S. 578, 17 Sup. Ct. 198, 41 L. Ed. 560. The court has carefully considered that case, and is of opinion that it does not apply to the case at bar. Counsel also referred to the San Diego Case, 174 U. S. 739, 19 Sup. Ct. 804, 43 L. Ed. 1154, as showing that the railroad com-

pany must show "beyond all doubt" that the rates complained of were confiscatory. This expression in the San Diego Case refers to the rule by which the court should be governed on a final hearing, and has no reference to a hearing on a preliminary motion for an injunction to preserve the status quo. It was also established in that case that the rates complained of would admit of a return of 6 per cent. upon the value of the property. While this court, sitting as a court of equity, possesses ample power to restrain the enforcement of an act of the Legislature in a proceeding of this character, pending a final hearing, it should be borne in mind that the legislation of North Carolina relating to railroads and the fixing of rates for the same contemplates that injunctions should be granted in cases like that under consideration, and the necessary means are provided by which the interests of the patrons of the road may be fully protected in such cases, in so far as freight rates are concerned.

It is provided under subhead B, "Injunctions, When Granted," § 1082, as follows:

"No judge shall grant an injunction, restraining order or other process staying or affecting, during the pending of any appeal, the enforcement of any determination of the Corporation Commission fixing rates or fares, without requiring as a condition precedent the executing and filing with the Corporation Commission of a justified undertaking in the sum of not less than twenty-five thousand dollars for any company whose road is of less length than fifty miles, and fifty thousand dollars for any company whose road is over fifty miles in length, conditioned that the company will make and file with the Corporation Commission a sworn statement every three months during the pending of the appeal of the items of freight, with names of shippers, carried over such company's road within the preceding ninety days, showing the freight charged and those fixed by the Corporation Commission; and in the event that the determination of the Corporation Commission appealed from is affirmed in part or in whole such company shall within thirty days pay into the treasury of North Carolina the aggregate difference between the freights collected and those fixed by the final determination of the matter appealed. Pub. Laws 1899, p. 291, c. 164, § 7."

The foregoing provision clearly indicates that it was the purpose of the Legislature not to interfere with the remedy by injunction in cases where it might appear that the rates fixed were confiscatory in their character, and the only limitation with respect to the same is the provision that in cases where it is sought to restrain an act fixing freight rates, that a bond should be required. (It may be that the state officials have overlooked this provision).

Under these circumstances, the court, in addition to being required by the rules, practice, and procedure in such causes to preserve the status quo pending the hearing, is admonished by the acts of the Legislature that in all such cases where it appears that complainant is about to suffer irreparable injury that it is the policy of the law of North Carolina to restrain the enforcement of such legislation pending the hearing upon giving ample security for the payment of such sums as may be deemed to be necessary to protect the rights of those affected by the rates established. While this provision of the North Carolina law affords ample provision for the protection of shippers of freight pending the final hearing, the statute is silent as to the traveling public; and, while it is contemplated that the enforcement of any act fixing

passenger rates may be restrained, nevertheless the Legislature in its wisdom did not deem it necessary to make any provision for protection of those whose rights might be affected in this respect by the granting of a temporary injunction. Thus it is clearly shown that it is not the policy of the Legislature of North Carolina to go to the extent which the federal courts have gone in such causes (notably in the case of Consolidated Gas Co. v. Mayer [C. C.] 146 Fed. 150) in protecting the rights of the traveling public. The allegations of the bill, which are supported by uncontradicted evidence, clearly show that, if the present rates are permitted to be enforced, the complainant will suffer great and irreparable injury in the event that the act in question should ultimately be declared unconstitutional. And in such event the difference between the proposed rate and the present rate would be a clear loss to the complainant, inasmuch as it would be impracticable for it to bring a suit to recover the difference between the proposed rate and the old rate against each individual who might in the meantime purchase a ticket, and the denial at this time of the remedy universally afforded by courts of equity, under such circumstances, would be to deprive complainant of a right guaranteed to it by the Constitution of the United States. While a railroad is not entitled to earn a profit on every mile of its road, nor upon every article carried by it, nevertheless it is entitled to earn a reasonable profit upon the entire intrastate business in the state.

It is shown by the evidence that the gross revenue from intrastate business in North Carolina in 1906 was $3,324,625. It is also shown that the minimum expense of earning this amount should be on the basis of 86.35 cents on $1 earned, and the aggregate expense thus incurred would be $2,870,814.33; that the maximum net earnings from intrastate business in North Carolina, not making any allowance for taxes, is $453,811.41; that the taxes chargeable to North Carolina for the fiscal year ending June 30, 1906, was $269,651.18; that the proportion of intrastate gross earnings to total gross earnings were 27.60 per cent; that 27.60 per cent. of the total taxes which should be charged to intrastate traffic shows that the intrastate taxes should have been for that year $74,423.73. Improvements and betterments not capitalized chargeable to North Carolina for the same year for the purpose of keeping the property up to modern standard and without additions to it amounted to $197,056.77. Twenty-seven and sixty one-hundredths per cent. of this last item which is assignable to intrastate traffic is $54,-633.04, thus making a total of taxes, improvements, and betterments not capitalized, chargeable against intrastate traffic for said year, $129,056.-77. The evidence shows that the complainant will sustain a loss of revenue by the proposed passenger rates of $275,055.53, a net loss from freight of $21,691.64, making a total loss of $296,747.17. So it will be seen from the foregoing that the net earnings from intrastate operations under the proposed rates and classifications would only be $28,007.47. That part of the complainant's property in North Carolina devoted to intrastate business was assessed for taxation in that state during the year ended June 30, 1906, at $7,213,222.74. In this connection it should be remembered that no class of property in North Carolina is assessed

at its true value for taxation. Nevertheless, if we assume the tax valuation of the property of complainant to be a proper method of ascertaining the value of its property chargeable to intrastate business, we find that the net earnings of complainant, under the proposed rates and charges for intrastate business, taking the year 1906 as a basis, would only amount to $^{39}/_{100}$ of 1 per cent. upon such valuation, before allowing anything for the payment of dividends upon the stock and interest on the bonds of complainant.

The complainant in this cause occupies a fiduciary relation to the holders of its mortgages, stocks, and bonds. The holders of these investments and securities are as much entitled to the protection of the law as any private citizen who may have invested his money in the mercantile business or any other private enterprise. To hold otherwise would be to discourage investments in those public enterprises which are indispensable to the development, progress, and growth of the country. If it is to be held by the courts that those who invest their capital in public enterprises of this kind are to be denied the equal protection of the laws, then the construction of railroads and other public utilities by private capital would at once cease, and the government would be required to embark in the untried, if not hazardous, undertaking of owning and controlling, not only the railroads of the country, but any other utilities which might be deemed necessary for the convenience and advantage of the public.

North Carolina has had a sad experience in attempting to operate railroads within her borders, and her efforts in that respect have proven disastrous in the extreme, and to-day the only railroad property owned by the state is being operated under leases which are deemed to be much more advantageous to the state than any plan of operation which it could adopt under its own management and control. The state of North Carolina undertook to construct and operate the Western Carolina Railroad, but its efforts proved to be a dismal failure, and, had it not been for the purchase of the same by the complainant, in all probability it would never have been completed, and to-day western Carolina would be inaccessible to the outside world.

The court does not deem it proper at this time to pass upon the validity of section 1 of the act relating to passenger rates, feeling, as it does, that the cause should be referred to a master in order that all the facts bearing upon that question should be ascertained and reported by him before a final determination as to the reasonableness of the rates imposed can be had.

Much has been said by counsel as to the power of the court in this cause to grant a temporary restraining order, as well as the expediency of the same. There can be no doubt as to the true rule by which the court is to be governed, when it appears that the complainant is about to suffer irreparable injury. In this instance, the act in question is challenged as being unconstitutional, and, as the court has said, the evidence now before it is sufficient to justify it in continuing the order heretofore granted until the final hearing. However, the court is not bound by this strict rule of construction in dealing with this question. In the case of Cotting v. Kansas Stockyards Company, 183 U.

S. 83, 22 Sup. Ct. 31, 46 L. Ed. 92, Circuit Judge Thayer, who heard the case below, decided that the act in question was valid, and, notwithstanding that the court in that case was of opinion that the act was constitutional and dismissed the bill, nevertheless, the learned judge granted an order restraining the enforcement of the act of the Legislature until the matter could be determined by the Supreme Court. That portion of the order embodied as a part of the final decree is as follows:

"The great importance of the questions involved in these cases will doubtless occasion an appeal to the Supreme Court of the United States, where they will be finally settled and determined. If, on such appeal, the Kansas statute complained of should be adjudged invalid for any reason, and in the meantime the statutory schedule of rates should be enforced, the stockyards would sustain a great and irreparable loss. Under such circumstances, as was said in substance by the Supreme Court in Hovey v. McDonald, 109 U. S. 161, 3 Sup. Ct. 136, 27 L. Ed. 888, it is the right and duty of the trial court to maintain, if possible, the status quo pending an appeal, if the questions at issue are involved in doubt; and equity rule 93 was enacted in recognition of that right. The court is of opinion that the cases at bar are of such moment and the questions at issue so balanced with doubt as to justify and require an exercise of the power in question. Therefore, although the bills will be dismissed, yet an order will at the same time be entered restoring and continuing in force the injunction which was heretofore granted for the term of 10 days, and, if in the meantime an appeal shall be taken, such injunction will be continued in force until the appeal is heard and determined in the Supreme Court of the United States, provided that, in addition to the ordinary appeal bond, the Kansas City Stockyards Company shall make and file in this court its bond in the penal sum of $200,000, payable to the clerk of this court and his successors in office, for the benefit of whom it may concern, conditioned that, in the event the decree dismissing the bills is affirmed, it will, on demand, pay to the party or parties entitled thereto all overcharges for yarding and feeding live stock at its stockyards in Kansas City, Kan., and Kansas City, Mo., which it may have exacted in violations of sections 4 and 5 of the Kansas statute relative to stockyards, approved March 3, 1897, since an injunction was first awarded herein, to wit, on April —, 1907; and that it will in like manner pay such overcharges, if any, as it may continue to exact in violation of said statute during the pendency of the appeal. * * *"

Thus it will be seen that in that instance, notwithstanding the fact that the circuit judge was of opinion that the statute challenged was valid, yet, in the exercise of his discretion, an order was made restraining the enforcement of the statute until there could be a final hearing of the same by the Supreme Court.

The action of Judge Thayer in that case affords a striking illustration as to the extent to which a court of equity will go in order to preserve the status quo and thus prevent irreparable injury in a cause where it has assumed jurisdiction. The Supreme Court held that Judge Thayer's action in continuing the restraining order, under the circumstances, was proper, and Mr. Justice Brewer, who delivered the opinion of the court, in referring to the action of the lower court, said:

"The learned circuit judge, in deciding the case, appreciated the importance of the questions involved, and, although denying the relief sought by the plaintiffs, exercised his power of continuing the restraining order until such time as these questions could be determined."

It should be observed that the learned justice concedes to the Circuit Court the power to continue the restraining order until the ques-

tions involved could be determined. And the reasons for continuing the restraining order in the case at bar are much stronger than those which induced Judge Thayer to restrain the enforcement of the act in that case pending the final determination of the same by the Supreme Court.

Notwithstanding the fact that the court had at the hearing of this motion considered section 4 of the rate act of 1907, and was of opinion that the same was unconstitutional, yet during the preparation of this opinion, and before the court had expressed its views in respect to the same, it was called upon to determine the validity of that section in the case of Ex parte Jas. H. Wood, 155 Fed. 190, and, after carefully considering the same, reached the conclusion that the said section was on its face unconstitutional and void.

Inasmuch as the allegations of the bill, supported by the evidence, show that, unless the restraining order heretofore granted is continued until the final hearing, the complainant will suffer great and irreparable injury, in the event the act in question should be finally declared invalid, the court is of opinion that such order should be continued until the final hearing; and, in order that the traveling public may be fully protected in the event that the act should be ultimately declared to be valid, the complainant will be required to give ample bond to secure the payment of a sufficient sum into the registry of the court to reimburse those who may purchase tickets of complainant in the meantime, a sum equal to the difference between the present rate and the proposed rate.

NOTE. Subsequent to the granting of an order continuing the interlocutory injunction until the final hearing, to wit, on the 29th day of July, 1907, the complainant through its counsel filed a petition asking a modification of the interlocutory injunction to the extent of permitting it to put in operation a 2¼ cent rate in accordance with the provisions of the act passed by the Legislature of North Carolina.

It is stated, in the petition substantially that the Governor of the state had threatened to institute proceedings in the state court for the purpose of annulling the lease of the North Carolina Railroad Company, and also to call a special session of the Legislature with the view of securing the passage of additional legislation affecting the rights of the complainant; that a number of suits had been instituted in the state courts against complainant and its agents on account of its having complied with the terms of the decree of this court granting an interlocutory injunction; that the Governor of the state had issued a circular letter to the superior court judges of the state, advising them that it was their duty to see that all parties who failed to comply with the provisions of the act of 1907 were prosecuted, regardless of the order which this court had made, temporarily suspending the enforcement of the same; that these attacks on the part of the Governor and state officials against the company and its agents and in the manner therein described had had the effect of demoralizing the servants, agents, and employés of the company to such an extent as to render it well nigh impossible for complainant to properly discharge the duties which it

owed the public as a common carrier, and that, owing to many other reasons stated therein, the complainant was deterred from asserting the rights which were guaranteed it by the Constitution of the United States. For a more complete statement of facts reference is made to the petition which has been filed, and is a part of the record.

After considering the petition, the court made the following statement:

"The application now made to modify the injunctions heretofore granted in these causes present a condition of affairs unprecedented in the judicial annals of this country. After a full and complete hearing of the matters raised by the pleadings in these causes, injunctions, pending the hearing of the questions involved in the original suits, were granted. The court, in granting such injunctions, followed the course approved by the Supreme Court of the United States in the cases of Smyth v. Ames, Reagan v. Farmers' Loan & Trust Company, Cotting v. Kansas Stockyards Company, and Prout v. Starr, and followed by the Circuit Courts of the United States in numerous other cases."

The effect of the order restraining the Corporation Commission of North Carolina et al. was to preserve the rights of the parties until the master to whom this cause had been referred could have an opportunity to report the facts and thereby enable the court to correctly determine whether the act in question is confiscatory, and, in order to protect the traveling public, the complainants were required to give ample bond and security to secure the payment into the registry of the court a sum sufficient to pay the difference between the present rate and the proposed rate to those who might in the meantime purchase tickets.

It is unjust to say that the question of states' rights is involved in this controversy. It is equally unjust to insist that what the court has done in the premises was an interference on the part of the federal court with the state courts. However, on the other hand, there has been a manifest disposition on the part of the state officials to interfere with the orderly procedure of the federal court in the exercise of those powers necessarily incident to the protection of its jurisdiction.

If this kind of obstruction should prevail, and citizens are thus to be denied the rights guaranteed them by the Constitution of the United States, then those provisions of the Constitution would become a dead letter, as there would be no means of enforcing them. When the motion for an interlocutory injunction was made in these causes, there was full argument before me by counsel representing the complainant and by counsel representing the defendants, the members of the Corporation Commission, the Attorney General, and the Assistant Attorney General of North Carolina. This argument lasted over several days and covered all points at issue. Upon this argument and my consideration of the case I entered the interlocutory injunctions. On a subsequent occasion the matter was again presented on the trial of a writ of habeas corpus, at which time a written opinion was delivered fully stating the views of the court. The court feels no doubt as to the soundness of the views therein expressed, nor as to its power and duty to enter the interlocutory decree, nor, in order to protect the jurisdiction of this court, to discharge on habeas corpus the persons who had been arrested by the state authorities for compliance with the orders of this court.

The court still considers that it would be its duty to continue this protection whenever its action in the premises should be thus lawfully invoked. But, as the complainants, for the protection of whose rights the interlocutory decrees were entered, now move the court permission to surrender the protection of said order to the extent indicated in their respective petitions, there is nothing for the court to do except to grant the permission prayed.

In view of the facts contained in the petition, the court at that time entered an order modifying the order theretofore granted in accordance with the request of the petitioner.